McGEE, Chief Judge.
Tekenya Boyd ("Defendant") appeals her convictions for assault with a deadly weapon with intent to kill, assault by pointing a gun, and discharging a firearm within city limits. We find no plain or prejudicial error.
I. Background
Defendant and her boyfriend, John Nesbitt ("Mr. Nesbitt"), went to a Quik Shoppe convenience store and gas station ("the store") located at 1500 Eastway Drive in Charlotte around 3:00 a.m. on 6 April 2014. Store employees Ahmeira Deese ("Ms. Deese") and Nathan Kazadi ("Mr. Kazadi") were working in the store when Defendant and Mr. Nesbitt entered. Ms. Deese was working as a cook and Mr. Kazadi was working as a cashier. Several days prior, Defendant and Mr. Nesbitt had entered the store around 1:00 a.m. and caused a verbal disturbance that resulted in Ms. Deese asking them to leave the premises. When Defendant and Mr. Nesbitt returned on 6 April, Ms. Deese indicated to Mr. Kazadi that they had been "banned from the store" and requested that Mr. Kazadi ask them to leave, which he did. According to Mr. Kazadi, Defendant and Mr. Nesbitt began "insult [ing him] and curs[ing at] everybody in the store[.]" Mr. Nesbitt "pick[ed] up [a] box of candy and [threw] it at [Mr. Kazadi]" before leaving the store with Defendant. Defendant and Mr. Nesbitt "left [the store] and went outside [but] came back in, [and] words were exchanged. [Defendant and Mr. Nesbitt] went back outside again, and [Mr. Nesbitt] got a cup out of his car that had ice in it, and came back in[to the store] and threw it in [Mr. Kazadi's] face." Mr. Kazadi followed Mr. Nesbitt out of the store and "[they] start[ed] fighting outside."
As the physical altercation between Mr. Kazadi and Mr. Nesbitt continued, Defendant "went to [Mr.] Nesbitt's SUV, retrieved a [nine millimeter] Luger [handgun], and approached [Mr.] Kazadi with the gun drawn." Defendant pointed the gun at Mr. Kazadi. When Mr. Kazadi saw the gun pointed at him, he ran. There was conflicting testimony at trial as to whether Defendant fired the gun before or after Mr. Kazadi began running away, but Defendant concedes that "[a]s [Mr.] Kazadi ran, [she] fired three to four [gun]shots." Mr. Kazadi heard several more gunshots as he ran, although he "didn't turn back." Mr. Kazadi was not shot or injured. He hid in a wooded area behind a nearby carwash, where he "wait[ed] to hear the sirens from the police car before [returning to the store]."
From inside the store, Ms. Deese saw Defendant pointing the gun at Mr. Kazadi and then heard a single gunshot. Ms. Deese testified she "didn't actually see [Defendant] [pull the trigger], but ... [saw Defendant] with the gun the whole time. So when the gun went off ... [Defendant] still had the gun. There wasn't [anyone else] around [Defendant], ... so that's how [Ms. Deese] knew [Defendant] did the shooting." After hearing the first gunshot, Ms. Deese "grabbed [a] cordless phone [and] ran to the back [of the store]" to call the police. Before police arrived, Defendant and Mr. Nesbitt left the scene in the SUV ("the SUV") from which Defendant had retrieved the handgun. A store customer gave Ms. Deese the SUV's license plate number, and Ms. Deese provided it to police.
Officers from Charlotte-Mecklenburg Police Department ("CMPD") responded to Ms. Deese's 911 call and took statements of Ms. Deese and Mr. Kazadi at the scene. CMPD crime scene investigator Officer Kharyn Nix photographed the scene and collected three discharged cartridge casings and three live cartridges. CMPD Detective Sarah Carey ("Detective Carey") ran the SUV's license plate tags on 7 April 2014. The SUV, a 2014 Ford Expedition, was registered to a car rental company and rented in the name of Mr. Nesbitt. CMPD Officer Billie Burleson, accompanied by Mr. Nesbitt's federal probation officer, searched Mr. Nesbitt's residence on 11 April 2014. Defendant and Mr. Nesbitt were present during the search. The officers also searched the SUV, which was parked outside Mr. Nesbitt's apartment. They recovered one spent nine millimeter Luger shell casing from the SUV. A CMPD firearms examiner conducted a comparison of the three discharged cartridge cases collected at the crime scene and the discharged cartridge case found in the SUV. All casings were nine millimeter Luger cartridge cases. The firearms examiner formed the opinion that all four cartridges were discharged from the same firearm, but was unable to determine how closely in time they were fired.
CMPD Officer Candace Miles showed Ms. Deese two separate photographic lineups on 17 April 2014. Ms. Deese identified Defendant as the individual who "pulled the gun and fired at [Mr. Kazadi]," and Mr. Nesbitt as the individual who "got into the [6 April 2014] confrontation with [Mr. Kazadi]." CMPD Officer William Pallone showed Mr. Kazadi two separate photographic lineups on 16 April 2014. Mr. Kazadi identified Mr. Nesbitt as the person with whom he was "one hundred percent certain" he had the physical altercation on 6 April 2014. He identified Defendant as the individual he was "[forty-five] to [fifty] [percent]" certain had fired the gun at him.
Warrants were issued on 17 April 2014 for Defendant's arrest on charges of assault with a deadly weapon with intent to kill, assault by pointing a gun, and discharging a firearm within city limits. Defendant voluntarily surrendered to the sheriff's office on 24 April 2014 and was released on bond shortly thereafter. Defendant was indicted on all charges on 20 January 2015. Following a jury trial, Defendant was convicted on all charges on 17 December 2015. The trial court sentenced Defendant to a term of twenty-five to forty-two months' imprisonment, which was suspended with an intermediate punishment of thirty-six months of supervised probation. Defendant appeals.
II. Failure to Instruct Jury on Lesser Included Offense
Defendant argues the trial court committed plain error by not instructing the jury on the lesser-included offense of assault with a deadly weapon because there was contradictory evidence regarding her intent to kill Mr. Kazadi.
A. Standard of Review
As Defendant concedes, defense counsel did not request that the trial court give a jury instruction on assault with a deadly weapon.
[A] defendant may not challenge a trial court's failure to instruct a jury on lesser-included offenses when the defendant ... did not request instructions on lesser offenses. In such instances, a defendant may challenge jury instructions [only] by ... contending that the instructions amount[ed] to plain error.
State v. Thacker , 196 N.C. App. 512, 514, 675 S.E.2d 670, 672 (2009) ; see also N.C. R. App. P. 10(a)(2) ("A party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict [.]"). "Under the plain error standard, [a] defendant must establish the error had a probable impact on the jury's finding that the defendant was guilty." State v. Hole , --- N.C. App. ----, ----, 770 S.E.2d 760, 762 (2015) (citation and internal quotation marks omitted); see also State v. Boyett , 224 N.C. App. 102, 105, 735 S.E.2d 371, 374 (2012) ("A prerequisite to our engaging in a plain error analysis is the determination that the [jury] instruction complained of constitutes error at all; then, before deciding that an error by the trial court amounts to plain error, the appellate court must be convinced that absent the error the jury probably would have reached a different verdict." (citation, quotation marks, and internal alterations omitted)). "[It] is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." State v. Lawrence , 365 N.C. 506, 517, 723 S.E.2d 326, 333 (2012) (citations and quotation marks omitted).
B. Analysis
"It is well-settled that the trial court must submit and instruct the jury on a lesser included offense when, and only when, there is evidence from which the jury could find that [a] defendant committed the lesser included offense." State v. Harris , 222 N.C. App. 585, 591, 730 S.E.2d 834, 839 (2012) (citation and internal quotation marks omitted). "[W]hen the State's evidence is positive as to each element of the crime charged and there is no conflicting evidence relating to any element, the submission of a lesser included offense is not required." Id.
Defendant contends there was conflicting evidence as to whether she "shot at [Mr.] Kazadi intending to kill him" and, as a result, the trial court was required to instruct the jury on the lesser included offense of assault with a deadly weapon. Defendant submits that "[b]ecause the evidence ... was not unequivocal that [she] assaulted [Mr.] Kazadi with an intent to cause his death, the jury could have found that [Defendant] fired the gun without intending to kill [Mr.] Kazadi." However, assuming arguendo there was conflicting evidence regarding Defendant's intent to kill Mr. Kazadi such that the trial court should have instructed the jury on assault with a deadly weapon, Defendant misstates the standard applied under plain error review. Because Defendant did not request the instruction, our inquiry is not whether the jury "could have found" that Defendant lacked the intent to kill Mr. Kazadi. Instead, the question is whether, if instructed on the lesser included offense of assault with a deadly weapon, the jury probably would have found Defendant not guilty of assault with a deadly weapon with intent to kill. See State v. Carter , 366 N.C. 496, 500, 739 S.E.2d 548, 551 (2013) ("The necessary examination [under the plain error standard] is whether there was a 'probable impact' on the verdict, not a possible one." (citation omitted) (second emphasis added)); State v. Reilly , 71 N.C. App. 1, 10-11, 321 S.E.2d 564, 570 (1984), aff'd , 313 N.C. 499, 329 S.E.2d 381 (1985) (holding it was not plain error for trial court to fail to give an unrequested instruction where "its absence had no probable impact in the jury finding of guilt[.]").
"A trial court does not err in failing to provide an unrequested ... instruction unless the error or impropriety is extreme ... [in that it] had [a] probable impact on the jury's final determination." State v. Hinnant , 238 N.C. App. 493, 500, 768 S.E.2d 317, 322 (2014) (emphasis in original). Our Supreme Court has held that "[t]o establish a 'probable impact' in [determining whether it was plain error to fail to give an unrequested instruction on a lesser included offense], [a] defendant would have to show that the jury would have disregarded any [evidence favorable to the State] in favor of [evidence favorable to the defendant]." Carter , 366 N.C. at 500, 739 S.E.2d at 551-52. Mere inconsistencies in a witness's testimony alone are insufficient to demonstrate plain error. Id. at 500, 739 S.E.2d at 551. In the present case, we are not persuaded that the trial court's failure to give an instruction on assault with a deadly weapon amounted to plain error.
Defendant points to a number of alleged inconsistencies in the evidence presented at trial that she alleges "raise[d] doubt regarding the intent to kill element." However, contrary to Defendant's contention, the State was not required to "unequivocally show the greater offense of [assault with a deadly weapon with intent to kill]."
The only difference in what the State must prove for the offense of misdemeanor assault with a deadly weapon and felony assault with a deadly weapon with intent to kill is the element of intent to kill. Where all the evidence tends to show a shooting with a deadly weapon with the intent to kill, the trial court does not err in refusing to submit the lesser included offense of assault with a deadly weapon.
State v. Riley , 159 N.C. App. 546, 553-54, 583 S.E.2d 379, 385 (2003) (citations omitted). In proving the element of intent to kill, "the State is entitled to rely on reasonable inferences from the circumstances surrounding the assault[.]" State v. Ransom , 41 N.C. App. 583, 584, 255 S.E.2d 237, 238 (1979). This Court has held that
[a]n intent to kill, being a state of mind of the defendant not easily susceptible of proof, ordinarily must be proved by circumstantial evidence from which a jury may reasonably infer intent. The nature of the assault, the manner in which it was made, and the surrounding circumstances are all matters from which an intent to kill may be inferred.... Therefore, our inquiry concerns whether there were sufficient circumstances attendant with the assault which would permit a jury reasonably to infer an intent to kill.
Id. (citations omitted).[1] In the present case, the State's evidence was sufficient to support a reasonable inference of an intent to kill. The uncontroverted evidence showed that, on 6 April 2014, as Mr. Nesbitt and Mr. Kazadi engaged in a physical altercation, Defendant retrieved a handgun from Mr. Nesbitt's SUV, pointed the gun directly at Mr. Kazadi, and fired three or four shots from the gun. While there may have been conflicting evidence about whether Defendant fired the gun before or after Mr. Kazadi began to flee, this Court has specifically held that "[w]here [a] defendant points a gun at the victim and pulls the trigger, this constitutes evidence from which intent to kill may be inferred." State v. Cromartie , 177 N.C. App. 73, 77, 627 S.E.2d 677, 680 (2006). Defendant admits she fired multiple shots as Mr. Kazadi was running away, at which point he no longer posed any threat to Mr. Nesbitt. Because the jury could reasonably infer an intent to kill from this evidence, we cannot say that, if instructed on the lesser included offense of assault with a deadly weapon, the jury probably would have found Defendant not guilty of assault with a deadly weapon with intent to kill. This argument is overruled.
III. State's Comments on Defendant's Post-Arrest Silence
Defendant next contends the State impermissibly commented on her post-arrest silence during its direct examination of Detective Carey.
A. Standard of Review
Defendant failed to object at trial to either the State's line of questioning or Detective Carey's responses.
In the absence of an objection, the standard of review to determine whether the trial court should have intervened ex mero motu is whether the allegedly improper [reference to a defendant's constitutional right to remain silent] was so prejudicial and grossly improper as to interfere with [the] defendant's right to a fair trial.
State v. Walls , 342 N.C. 1, 48, 463 S.E.2d 738, 763 (1995) (citation and internal quotation marks omitted); see also State v. Richardson , 226 N.C. App. 292, 299, 741 S.E.2d 434, 440 (2013) (holding that, where defendant failed to object at trial to prosecutorial questions and comments challenged on appeal, review was "limited to determining whether plain error occurred."). Defendant bears the burden of demonstrating that, absent the allegedly improper comments on her post-arrest silence, the jury probably would have found Defendant not guilty. See State v. Walker , 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986).
B. Analysis
Both the United States and North Carolina Constitutions protect a criminal defendant's right to remain silent. See State v. Lane , 301 N.C. 382, 384, 271 S.E.2d 273, 275 (1980). "[After] a defendant has been given his Miranda warnings, his silence may not be used against him." State v. Moore , 366 N.C. 100, 104, 726 S.E.2d 168, 172 (2012) (citations and internal quotation marks omitted). "Whether the State may use a defendant's silence at trial depends on the circumstances of the defendant's silence and the purpose for which the State intends to use such silence." State v. Boston , 191 N.C. App. 637, 648, 663 S.E.2d 886, 894 (2008). "For example, a defendant's decision to remain silent following her arrest cannot be used as substantive evidence of her guilt of the crime charged." Id. (citing State v. Ward , 354 N.C. 231, 266, 555 S.E.2d 251, 273 (2001) ).
On appeal, Defendant challenges the following exchange between the prosecutor and Detective Carey as an improper commentary upon Defendant's post-arrest silence:
STATE: And after [Defendant's] arrest did you ever speak with her?
DETECTIVE CAREY: [Defendant] turned herself into the sheriff's department on [24 April 2014]. By the time I actually had gotten to her, she had already been bonded out, so she was no longer in custody.
STATE: And since that time, has [Defendant] attempted to contact you at any point?
DETECTIVE CAREY: She has not.
STATE: Has [Defendant] given you any sort of statement or anything like that with regards to this case?
DETECTIVE CAREY: She has not.
Defendant contends this exchange was improper because "[t]he only purpose[s] served by the prosecutor's questions ... [were t]o paint [Defendant] in a negative light and to call into question the legitimacy of [Defendant's] trial defenses." According to Defendant, "[t]he [State's] questions and [Detective] Carey's responses clearly suggested [Defendant] purposely chose not to speak with the CMPD and explain why her actions were justified when defendants in [a similar] position generally provide[ ] post-arrest statements to law enforcement." Even assuming the trial court erroneously allowed the above exchange, Defendant has not demonstrated the error amounted to plain error.
Where, as in the present case, a defendant did not object to prosecutorial comments at trial, "only an extreme impropriety on the part of the prosecutor will compel [the reviewing court] to hold that the trial judge abused his discretion in not recognizing and correcting ex mero motu an argument that defense counsel apparently did not believe was prejudicial when originally spoken." Ward , 354 N.C. at 265, 555 S.E.2d at 273 (citation and quotation marks omitted). In deciding whether prosecutorial comments upon a defendant's failure to make a post-arrest statement to investigating officers constituted plain error, this Court considers
(1) whether the prosecutor directly elicited the improper testimony or explicitly made an improper comment; (2) whether the record contained substantial evidence of the defendant's guilt; (3) whether the defendant's credibility was successfully attacked in other ways in addition to the impermissible comment upon his or her decision to exercise his or her constitutional right to remain silent; and (4) the extent to which the prosecutor emphasized or capitalized on the improper testimony by, for example, engaging in extensive cross-examination concerning the defendant's post-arrest silence or attacking the defendant's credibility in closing argument based on [the defendant's] decision to refrain from making a statement to investigating officers.
Richardson , 226 N.C. App. at 302, 741 S.E.2d at 442. In conducting this analysis, no single factor "should be deemed determinative[.]" Id.
Applying these considerations to the present case, we are not convinced that the prosecutorial comments Defendant challenges on appeal were plainly erroneous. Although the State "directly elicited" Detective Carey's responses regarding the fact that Defendant did not contact law enforcement officers following her arrest or offer any statement related to the charges against her, it did not excessively emphasize Defendant's post-arrest silence, extensively examine Detective Carey on the matter, or refer to Defendant's post-arrest silence during closing arguments. If anything, defense counsel emphasized Defendant's post-arrest silence by cross-examining Detective Carey as follows:
DEFENSE COUNSEL: Is it typical that in your experience do individuals charged with criminal offenses come and attempt to talk with you about the charges after they've been arrested?
DETECTIVE CAREY: I wouldn't say that there's necessarily a typical-what a defendant does. Each person is going to be different and each case is going to be different. I have had defendants who have come and talked to me, that have reached out to me. On other cases I have had defendants that have not, so it's each case and each person is different.
DEFENSE COUNSEL: How ... many years have you worked for the [CMPD]?
DETECTIVE CAREY: A little over eight years.
DEFENSE COUNSEL: In your eight years of experience how often have you had defendants contact you after they've been arrested, with pending charges, and desired to give you a statement about what had occurred?
DETECTIVE CAREY: I'm not sure that I can put a specific number on that. I mean, I'd have to look over all my cases[.]
DEFENSE COUNSEL: In fairness, that's pretty rare, that's very rare; is that correct?
DETECTIVE CAREY: I can't say one way or another.
See N.C. Gen. Stat. § 15A-1443(c) (2015) ("A defendant is not prejudiced by ... error resulting from his own conduct."). Additionally, the record contained substantial evidence of Defendant's guilt, including undisputed evidence that, during the incident in question, Defendant retrieved a gun, pointed it at the victim, and fired several shots as the victim fled. We conclude that, "given the brief, passing nature of the [reference to Defendant's failure to give a post-arrest statement] in the context of the entire trial, the evidence is not likely to have tilted the scales in the jury's determination of [D]efendant's guilt or innocence." See Moore , 366 N.C. at 107, 726 S.E.2d at 174 (citation and internal quotation marks omitted).
IV. Flight Instruction
A. Standard of Review
Defendant argues the trial court committed prejudicial error when it issued a flight instruction to the jury over defense counsel's objection. According to Defendant, the instruction was not supported by the evidence. "As a question of law, this Court reviews the sufficiency of jury instructions de novo ." State v. Boyd , 214 N.C. App. 294, 299, 714 S.E.2d 466, 471 (2011) (citation omitted). Because Defendant objected to the flight instruction, we review the instruction
contextually and in its entirety. The charge will be held to be sufficient if it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed. Under such a standard of review, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury.
State v. Ballard , 193 N.C. App. 551, 559, 668 S.E.2d 78, 83 (2008) (citation omitted); see also State v. Castaneda , 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009) ("[A]n error in jury instructions is prejudicial and requires a new trial only if 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.' " (quoting N.C. Gen. Stat. § 15A-1443(a) ). A defendant bears the burden of showing prejudice. See id. In determining whether a flight instruction was supported by sufficient evidence, this Court views the evidence in the light most favorable to the State. See State v. Grooms , 353 N.C. 50, 80, 540 S.E.2d 713, 732 (2000).
B. Analysis
"[I]n order to justify an instruction on flight there must be some evidence in the record reasonably supporting the theory that the defendant fled after the commission of the crime charged." State v. Rainey , 198 N.C. App. 427, 442, 680 S.E.2d 760, 772 (2009) (citation and quotation marks omitted) (alteration in original). Further, "[t]o merit an instruction on flight, the defendant's leaving of the crime scene must be bolstered by some evidence that [the] defendant took steps to avoid apprehension." Id. (citation and internal quotation marks omitted). In the present case, the trial court instructed the jury as follows:
The State contends and the defendant denies that the defendant fled. Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in and of itself to establish the defendant's guilt.
See State v. Self , 280 N.C. 665, 672, 187 S.E.2d 93, 97 (1972) ("North Carolina has long followed the rule that an accused's flight from a crime shortly after its commission is admissible as evidence of guilt."); Rainey , 198 N.C. App. at 439, 680 S.E.2d at 770 ("Evidence of flight does not create a presumption of guilt, but is to be considered with other factors in deciding whether the circumstances amount to an admission of guilt or reflect a consciousness of guilt." (citation and internal quotation marks omitted)).
Defendant does not dispute that she left the crime scene before police arrived on 6 April 2014. However, as Defendant notes, merely leaving a crime scene "is not enough to support an instruction on flight. There must also be some evidence that [the] defendant took steps to avoid apprehension ." State v. Holland , 161 N.C. App. 326, 330, 588 S.E.2d 32, 36 (2003) (citation and quotation marks omitted) (emphasis added). Defendant submits that the State failed to present any evidence that "[raised a reasonable inference] or conclusively proved [Defendant] attempted to avoid apprehension once she ... left the [store]."
The State contends the following evidence was sufficient to permit a flight instruction:
[A]fter shooting at [Mr.] Kazadi, [Defendant] quickly left the scene with [Mr.] Nesbit[t].... For over two weeks [Defendant] did not turn herself in or contact police regarding the events at the store. Even when detectives conducted a search at [Mr.] Nesbit[t]'s home, where [D]efendant was at the time, [D]efendant did not voluntarily come forward. Not until after a warrant was issued for [D]efendant's arrest did she surrender to police.
We disagree with the State that the above evidence demonstrates Defendant "took steps to avoid apprehension" after leaving the crime scene on 6 April 2014. The State's emphasis on Defendant's failure to "turn herself in or contact police" in the days following the shooting is misplaced. This Court has expressly rejected the argument that "a failure to communicate with law enforcement is sufficient for an instruction on flight." See State v. Campos , --- N.C. App. ----, ----, 789 S.E.2d 492, 496 (2016). Our decisions addressing "steps to avoid apprehension" have focused on defendants' efforts to elude discovery by law enforcement, not defendants' failure to assist in their own apprehension. See , e.g. , State v. Davis , 226 N.C. App. 96, 98, 738 S.E.2d 417, 419 (2013) (finding sufficient evidence defendant took steps to avoid apprehension, where "officers were unable to locate defendant for several months following the shooting" and "U.S. Marshals found defendant three months later in Florida."); State v. Shelly , 181 N.C. App. 196, 209, 638 S.E.2d 516, 526 (2007) (finding trial court did not err in giving flight instruction, where defendant left crime scene, did not return home, and "spent the night at the home of his cousin's girlfriend, an action that was not part of [d]efendant's normal pattern of behavior and could be viewed as a step to avoid apprehension."). In State v. Thompson , 328 N.C. 477, 402 S.E.2d 386 (1991), our Supreme Court found that evidence the defendant fled the crime scene, drove to an off-limits area of the military base where the defendant was stationed, and drove off when approached by a military police car was insufficient to warrant a flight instruction. This Court later distinguished Thompson by noting that "the defendant [in Thompson ] returned to a place where, if necessary, law enforcement officers could find him. Essentially, the defendant returned home." Shelly , 181 N.C. App. at 209, 638 S.E.2d at 525-26.
In the present case, the State presented no evidence tending to show where Defendant went or what Defendant did immediately after leaving the crime scene on 6 April 2014. See , e.g. , State v. Blakeney , 352 N.C. 287, 315, 531 S.E.2d 799, 819 (2000) (finding sufficient evidence defendant took steps to avoid apprehension where defendant fled crime scene and "[r]ather than return home, as originally intended, defendant then went to [another individual's] house and remained there overnight."); State v. House , 340 N.C. 187, 198, 456 S.E.2d 292, 298 (1995) (finding sufficient evidence defendant took steps to avoid apprehension where defendant left murder scene, drove deceased victim to a deserted area, dumped the body and, after returning home but prior to his arrest, defendant cleaned and painted his truck "so that there was no evidence of blood on the truck."). As the State concedes, Defendant was present when officers searched Mr. Nesbitt's residence on 11 April 2014. There was no evidence that Defendant attempted to hide, leave, or otherwise evade the officers at that time. Additionally, potentially incriminating evidence had not been removed from Mr. Nesbitt's SUV. The State presented no evidence that Defendant left the Charlotte-Mecklenburg area between 6 April 2014 and 24 April 2014, when she voluntarily surrendered to law enforcement. See State v. Jefferies , 333 N.C. 501, 510, 428 S.E.2d 150, 155 (1993) (finding evidence supported flight instruction where defendant left Charlotte the morning after committing murder, drove to Virginia, "and was not apprehended for two years."). The State failed to demonstrate that, prior to Defendant's arrest, law enforcement officers could not have located Defendant had they attempted to do so . We conclude there was insufficient evidence that Defendant took steps to avoid apprehension in the hours or days after leaving the scene of the crime on 6 April 2014. This conclusion does not end our inquiry.
"If a trial court erroneously proffers a flight instruction to the jury, the instruction must also sufficiently prejudice the defendant before a new trial can be granted on appeal." Campos , --- N.C. App. at ----, 789 S.E.2d at 497 (citation omitted). In State v. Hope , 189 N.C. App. 309, 657 S.E.2d 909 (2008), this Court held that an improper flight instruction "was not unduly prejudicial so as to amount to reversible error. In light of the overwhelming evidence against [the] defendant, ... we f[ound] no reasonable possibility that a different result would have been reached had the error been excluded." Id. at 320, 657 S.E.2d at 915. We likewise find no reasonable possibility of a different result at Defendant's trial if the court had not given the flight instruction challenged in the present case. As discussed above, the State presented substantial evidence of Defendant's guilt. We further note the jury was properly instructed that proof of flight is not sufficient, in and of itself, to establish a defendant's guilt. Thus, to the extent the jury was erroneously permitted to consider Defendant's alleged flight as one factor among the "combined circumstances" of the case, we conclude the error "had a negligible effect on the jury's determination of [D]efendant's guilt." See State v. Wright , 151 N.C. App. 493, 499, 566 S.E.2d 151, 155 (2002).
V. Cumulative Impact of Alleged Errors
Defendant argues the cumulative impact of multiple trial errors rendered her trial fundamentally unfair. "Cumulative errors lead to reversal when taken as a whole they deprived [the] defendant of his due process right to a fair trial free from prejudicial error." State v. Wilkerson , 363 N.C. 382, 426, 683 S.E.2d 174, 201 (2009) (citation and internal quotation marks omitted). Specifically, Defendant contends "the cumulative impact of the prosecutor's and [Detective] Carey's unconstitutional comments regarding [Defendant's] post-arrest silence and the trial court's erroneous flight instruction deprived [Defendant] of her right to a fair trial free from prejudicial error." However, as we have concluded that Defendant has failed to demonstrate plain or prejudicial error, respectively, in making those arguments, we also find no cumulative error. See State v. Roddey , 110 N.C. App. 810, 816, 431 S.E.2d 245, 249 (1993).
VI. Conclusion
For the foregoing reasons, we find Defendant received a trial free from plain or prejudicial error.
NO PLAIN ERROR IN PART, NO PREJUDICIAL ERROR IN PART.
Report per Rule 30(e).
Judges DAVIS and MURPHY concur.

In the present case, the jury was properly instructed: "Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonable prudent person would ordinarily draw therefrom."